# UNITED STATES DISTRICT COURT
# DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>YEIMY DIAZ-LARA,<br>ANNA LARA-ZELAYA,<br><br>Defendants. | Case 3:17-cr-00152-TMB-DMS<br><br>**FINAL REPORT AND RECOMMENDATION**[1]<br>**TO DENY MOTION TO SUPPRESS [Doc. 83]** |

## I. INTRODUCTION

Defendant Yeimy Diaz-Lara has filed a motion to suppress communications obtained as the result of wiretap warrant 3:15-mc-00027 (Doc. 83). Defendant Anna Lara-Zelaya joined (Doc. 89).[2]

The defense motion argues the wiretap was unlawful because the affidavit supporting its application did not satisfy the "necessity requirement" of 18 U.S.C. section 2518—that is, it did not show that law enforcement had adequately pursued other investigative methods before seeking authorization for the wiretap (Doc. 83 at 5-6). The government filed a response in opposition (Doc. 103), in which it argued the wiretap application showed necessity. Because the parties rely upon the four

---

[1] This report and recommendation is being issued as a final report and recommendation. Pursuant to Fed. R. Crim. P. 59(b)(3), any objections will be considered by the District Court Judge who will accept, reject, or modify the recommendation, or resubmit the matter to the Magistrate Judge for additional consideration and recommendations.

[2] However, Ms. Lara-Zelaya has since filed a Notice of Intent to Change Plea (Doc. 101).

*United States v. Diaz-Lara et al.*
3:17-cr-00152-TMB-DMS
Final R&R re Motion to Suppress

1

corners of the application and the accompanying affidavit for their arguments, no evidentiary hearing was held.

The defense motion is now ripe for consideration. For the reasons below, the Court recommends the District Court DENY the motion to suppress.

## II. STATEMENT OF FACTS

On July 30, 2015, Assistant United States Attorney Stephan Collins applied for an order pursuant to section 2518 of Title 18 of the U.S. Code, commonly referred to as the federal Wiretap Act. The application sought authorization to intercept wire communications to and from a specified cell-phone number (Target Telephone), registered to one Darwin Diaz-Lara (Darwin) (Doc. 85-1 at 2). The application was supported by an affidavit sworn by a special agent of the Drug Enforcement Administration (DEA) (Doc. 85-2).

The affidavit submitted that probable cause existed to believe that defendants Yeimy Diaz-Lara and Anna Lara-Zelaya and others had conspired with Darwin to commit several drug-trafficking related offenses (Doc. 85-2 at 3-4). This affidavit outlined an investigation begun in February 2013, more than two years before law enforcement applied for the wiretap. It also alleged that the Target Telephone was being used in connection with these offenses (Doc. 85-2 at 4).

The application stated several discrete investigative goals of the intended interception, specifically, discovery of (1) the identities and methods of operation of all the individuals who were supplying the drugs in question and who were distributing the drugs and their proceeds; (2) the exact locations at which the drugs

*United States v. Diaz-Lara et al.*
3:17-cr-00152-TMB-DMS
Final R&R re Motion to Suppress                                                             2

Case 3:17-cr-00152-TMB   Document 108   Filed 11/26/19   Page 2 of 13

and proceeds were obtained and stored; and (3) the methods through which the proceeds were laundered, distributed, and concealed (Doc. 85-2 at 5-6).

It also stated, "[b]ecause normal investigative procedures have been tried and failed, or reasonably appear unlikely to succeed if tried, or are otherwise too dangerous to try, this application for authorization to intercept wire and electronic communications is being sought to achieve these investigative goals" (Doc. 85-2 at 6). The affidavit identified no fewer than twelve other investigative methods which had been attempted and failed or which the agent believed were unlikely to succeed if tried. (Doc. 85-3 at 46-62).

### 1. Confidential Sources (Doc. 85-2 at 46-48)

Two confidential sources (CS) were developed. One of these gave vague background information regarding the trafficking but was unable to assist law enforcement with purchase of controlled substances from Diaz-Lara. The other had a relationship with Darwin dating back to 2012 and was currently bringing new customers to Darwin "which [the confidential source] has done in introducing a DEA undercover agent to [Darwin]." The affidavit noted, however, "[d]ue to [the source's] current role . . . it is very unlikely that [the source] will gain access to a position that would allow other individuals to learn the methods utilized by the [Darwin] organization."

*United States v. Diaz-Lara et al.*
3:17-cr-00152-TMB-DMS
Final R&R re Motion to Suppress 3
Case 3:17-cr-00152-TMB   Document 108   Filed 11/26/19   Page 3 of 13

### 2. Controlled Purchases (Doc. 85-2 at 48-49)

Law enforcement had made five drugs purchases from Darwin, totaling thirty-four ounces of illicit substances. The affidavit noted that the sum of these purchases were very costly to DEA. The most recent purchase had included an attempt to identify other co-conspirators via electronic surveillance. However, this attempt failed because Darwin personally responded to the call within 20 minutes.

### 3. Physical Surveillance (Doc. 85-2 at 49-51)

After tracking Darwin's vehicle via an installed GPS tracker for months, agents identified his residence but not his source for the drugs he sold. Surveillance also showed Darwin to be practiced in evasive maneuvers following transactions. The agent reasoned that physical surveillance also had limited potential since it might show the location of a meeting but not the topic or the role of the participants.

### 4. Undercover Agents (Doc. 85-2 at 52)

An undercover agent (UC) was used for the purchase of drugs, but the affidavit noted this came with financial cost and safety risk. Law enforcement had no reason to think the UC would be introduced to Diaz-Lara's source.

### 5. Search Warrants (Doc. 85-2 at 53-54)

The affidavit stated, "agents do not have any firm evidence that Darwin receives parcels containing illegal narcotics at his residence or that he does actually store drugs at the residence." It also stated, "in order to achieve maximum effectiveness with it, a search warrant must be coordinated with information

*United States v. Diaz-Lara et al.*
3:17-cr-00152-TMB-DMS
Final R&R re Motion to Suppress

4

Case 3:17-cr-00152-TMB   Document 108   Filed 11/26/19   Page 4 of 13

concerning the immediate whereabouts of the sought-after-evidence. This is best achieved with the interception of wire and electronic communications. Intercepted communications can inform investigators of the immediate presence of drugs, weapons or other contraband in a timely manner. A search warrant could then follow."

**6. Interviews, Grand Jury Subpoenas, Immunity** (Doc. 85-2 at 54-56)

Despite numerous interviews, they "have all proven unfruitful in providing direction regarding the chain of supply outside of Alaska," according to the application. Additionally, "[i]nterviews of the Target Subjects themselves would have the effect of alerting the Target Subjects and others, thereby compromising the investigation." The agent's experience and training, and consultation with AUSA Collins, led the agent to believe grand jury subpoenas would be unsuccessful because (a) if the subjects of the investigation were called to testify, they'd invoke their Fifth Amendment privileges; (b) immunity might foreclose prosecution of the most culpable people; and (c) most of the individuals identified in the investigation would likely lie under oath.

**7. Trash Searches** (Doc. 85-2 at 56)

Agents surveilled the Darwin's residence on two successive trash days but the bins were "up against his residence, very close to [Darwin's] side door," according to the application. As such, "there [was] no way agents could remove trash without being detected . . . . In light of the difficulty in surreptitiously

*United States v. Diaz-Lara et al.*
3:17-cr-00152-TMB-DMS
Final R&R re Motion to Suppress

5

Case 3:17-cr-00152-TMB   Document 108   Filed 11/26/19   Page 5 of 13

removing trash undetected, the risk of compromising the investigation by conducting trash search outweighs the limited information likely to be recovered."

### 8. Attempted Use of Other Surveillance Techniques (Doc. 85-2 at 56-58)

GPS had not shown how Darwin received shipments. Pole cameras were not a viable method of surveillance because there was no power source near Darwin's residence and the residence entrance was obscured from view, according to the application. A search warrant for location information updates was, the affidavit reasoned, "of limited usefulness, as [location information] is delayed by fifteen minutes, and it is unable to provide context or significance for any interactions that agents may observe while conducting surveillance." Plus, the application reasoned that to the degree Darwin was in the same place as his car, the GPS tracker on his vehicle would provide more precise location information.

### 9. Pen Register, Trap and Trace (Doc. 85-2 at 58-60)

These methodologies had been utilized but uncovered only phone numbers, not identities. Additionally, "[b]ased upon training and experience and by [Darwin's] own admission during undercover meetings, your affiant knows that it is common for drug traffickers to utilize multiple telephones and to switch telephones frequently in order to avoid detection by law enforcement. Therefore, toll analysis alone is of extremely limited usefulness."

### 10. Mail Cover Requests (Doc. 85-2 at 60-61)

The application stated: "Electronic surveillance indicates [Darwin] rarely frequents any specific residence on routine basis. Your affiant knows from

*United States v. Diaz-Lara et al.*
3:17-cr-00152-TMB-DMS
Final R&R re Motion to Suppress 6

Case 3:17-cr-00152-TMB   Document 108   Filed 11/26/19   Page 6 of 13

experience, that drug traffickers rarely use their residential address as an address to receive parcels containing illegal narcotics or as an address to ship parcels containing drug proceeds . . . . Agents have no gathered evidence indicating that [Darwin] or his associates in Anchorage are receiving drugs, or any other high value items, via USPS shipments. Therefore, your affiant believes that this investigative technique is unlikely to succeed in accomplishing the goals and aims of the investigation."

      **11. Financial Investigation** (Doc. 85-2 at 61-62)

The application stated that "while the investigation to date has succeeded in showing how [Darwin] utilizes numerous people to deposit his drug proceeds, and therefore avoids direct financial association with the drug funds, it has not yet demonstrated who his primary source of supply is. The financial investigation has further failed to demonstrate who his primary customer base is, or in what other ways he seeks to launder or otherwise conceal his illicit gains. Without wire and electronic interception, law enforcement will have difficulty proving that the source of [Darwin's] income is from drug-trafficking."

      **12. Arrests** (Doc. 85-2 at 62)

None had been made. The agent stated in the application, "I believe that strong circumstantial evidence exists demonstrating [three defendants] are involved in drug trafficking; however, without more direct evidence, the case may be difficult to prove at trial. Wire and electronic interception is necessary in order to generate this type of evidence."

*United States v. Diaz-Lara et al.*
3:17-cr-00152-TMB-DMS
Final R&R re Motion to Suppress

7

Case 3:17-cr-00152-TMB   Document 108   Filed 11/26/19   Page 7 of 13

After reviewing the application, United States District Judge Ralph R. Beistline entered an order authorizing the wiretap (Doc. 85-3).

### III. APPLICABLE LAW

**A. The Wiretap Act**

Federal law prohibits intentional interception of any wire, oral, or electronic communications except as specifically provided by the terms of the Wiretap Act. 18 U.S.C. §§ 2510-2522. The Act provides that "[a]ny attorney for the Government may authorize an application to a Federal judge of competent jurisdiction for . . . an order authorizing or approving the interception of electronic communications . . . when such interception may provide or has provided evidence of any Federal felony." 18 U.S.C. § 2616(3).

Because wiretaps are disfavored, each application must clear certain procedural hurdles. Section 2518 of the act requires applications to include, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). In considering the application, a judge must then affirm that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 25818(3)(c).

The Senate Committee on the Judiciary observed, "[n]ormal investigative procedures would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under

*United States v. Diaz-Lara et al.*
3:17-cr-00152-TMB-DMS
Final R&R re Motion to Suppress

8

Case 3:17-cr-00152-TMB   Document 108   Filed 11/26/19   Page 8 of 13

an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants." *Senate Comm. on the Judiciary, Report on the Omnibus Crime Control and Safe Streets Act of 1967*, S. Rep. No. 1097 at 101 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2190.

Courts have made clear that an application cannot simply assert, based on an agent's training or experience, that other, non-wiretap methods of investigation generally prove inadequate for achieving the investigative goals at hand. Instead, the affidavit must identify specific reasons why, in a particular case, other methods had proved unsuccessful or would be likely to. *See, e.g.*, *United States v. Spagnuoloi*, 549 F.2d 704, 710 (9th Cir. 1977); *United States v. Commito*, 918 F.2d 95, 97 (9th Cir. 1990); *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001); *United States v. Abascal*, 564 F.2d 821, 825 (9th Cir. 1977); *United States v. Kalustian*, 529 F.2d 585, 589 (9th Cir. 1975).

The government's application does not have to show that law enforcement agents exhausted every possible investigative alternative before seeking electronic surveillance. *Canales Gomez* at 1225-26; *United States v. McGuire*, 307 F.3d at 1196-97 (9th Cir. 2002); *United States v. Broner*, 792 F.2d 1504, 1506 (9th Cir. 1986).

**B. Standard of Review**

Although an appellate court reviews *de* novo whether an application for wiretapping was submitted in compliance with 18 U.S.C. § 2518(1)(c), it reviews a district court's determination that a wiretap is necessary for abuse of discretion.

*United States v. Diaz-Lara et al.*
3:17-cr-00152-TMB-DMS
Final R&R re Motion to Suppress

9

Case 3:17-cr-00152-TMB   Document 108   Filed 11/26/19   Page 9 of 13

*United States v. McGuire*, 307 F.3d 1192, 1197 (9th Cir. 2002); *United States v. Canales Gomez*, 358 F.3d 1221, 1225 (9th Cir. 2004).

Review of an authorized wiretap is limited. "Where (the underlying circumstances in the affidavit) are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *United States v. Kalustian*, 529 F.2d 585, 589 (9th Cir. 1975) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

## IV. DISCUSSION

### A. The Application Showed a Mail Cover Was Unlikely to Succeed

Diaz-Lara argues that law enforcement failed to show necessity because it did not pursue important other investigative methods before seeking the wiretap (Doc. 83 at 5-6). In particular, she says, law enforcement did not utilize a mail cover despite knowing that Darwin was receiving drugs from out-of-state.

The Wiretap Act does not require law enforcement to attempt every potential investigative method. *See Spagnuolo*, 549 F.2d at 710 ("The good faith effort [of law enforcement to determine the identify of those violating the law] need not have exhausted all possible uses of ordinary techniques."). An application need only show "why [potential methods] reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c); *see also Spagnuolo*, 549 F.2d at 710 ("What is required is a showing that in the particular investigation normal

*United States v. Diaz-Lara et al.*
3:17-cr-00152-TMB-DMS
Final R&R re Motion to Suppress

10

Case 3:17-cr-00152-TMB    Document 108    Filed 11/26/19    Page 10 of 13

investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time.").

The application specifically addressed why a mail cover was unlikely to further DEA's investigation. While the application relied in part on what the agent knew "from experience, that drug traffickers rarely use their residential address as an address to receive parcels containing illegal narcotics" (Doc. 85-2 at 60), it also cited specific information yielded by DEA's investigation into Darwin. For instance, "hundreds of man-hours of [physical and electronic] surveillance on [Darwin] and [Darwin]'s vehicle" had "not revealed the mechanism of importation" and had instead shown both "that [Darwin] mainly conducts narcotics transactions in residences or vehicles, locations concealed from continuous observation" and that "[Darwin] rarely frequents any specific residence on routine basis." This and other information cited in the application—including specific ways the investigation had shown Darwin to be practiced in evading physical and electronic surveillance— suggest he would have also undertaken efforts to evade detection by mail cover.

The defense highlights the fact that, "at the close of the wiretap period, Darwin in fact did receive multiple packages of large quantities of drugs shipped directly to his home address" (Doc. 83 at 9). However, this does not show that Darwin received drug parcels at his residence prior to the wiretap period. Indeed, the application stated DEA's investigation had uncovered no evidence Darwin received drugs through United States Postal Service, the carrier through which mail covers are generally conducted. Furthermore, the DEA Report of Investigation

*United States v. Diaz-Lara et al.*
3:17-cr-00152-TMB-DMS
Final R&R re Motion to Suppress

11

Case 3:17-cr-00152-TMB   Document 108   Filed 11/26/19   Page 11 of 13

shows that when investigators seized one of these packages, it had been sent by United Parcel Service and it was not addressed to Darwin or anyone living at the residence (Doc. 107-1 at 9). These facts support the application's assertions that Darwin made fairly sophisticated efforts to avoid routine practices that might leave him vulnerable to tracking and that a mail cover through the United Parcel Service would have proved unsuccessful. Diaz-Lara's retrospective use of evidence uncovered by the wiretap itself does not seriously undermine the credibility of this assertion.

### B. DEA's Ongoing Financial Investigation Was Unlikely to Advance Other Goals of the Investigation

Diaz-Lara also argues that DEA's ongoing financial investigation had already uncovered some of Darwin's money-laundering methods and the government failed to show the investigation would not have yielded further results. This is beside the point. The affidavit states the financial investigation had enjoyed success in showing "how [Darwin] utilizes numerous people to deposit his drug proceeds, and therefore avoid direct financial association with the drug funds" (Doc. 85-2 at 62). But discovering Darwin's methods of laundering drug proceeds was just one of three investigative goals of the intended interception. The affidavit made clear that the financial investigation had "not yet demonstrated who [Darwin's] primary source of supply is" or "who his primary customer base is, or in what other ways he seeks to launder or otherwise conceal his illicit gains" (Doc. 85-2 at 62). Given that these open questions are not purely financial in nature, it is not clear how the financial investigation might have fully answered them.

*United States v. Diaz-Lara et al.*
3:17-cr-00152-TMB-DMS
Final R&R re Motion to Suppress

12

Case 3:17-cr-00152-TMB   Document 108   Filed 11/26/19   Page 12 of 13

### C. The District Judge Did Not Abuse his Discretion in Determining the Application Showed Necessity for the Wiretap

The application in this case detailed the underlying circumstances of DEA's investigation into Darwin's drug-trafficking operation. *See Kalustian*, 529 F.2d at 589. It identified no less than twelve other investigatory methods and showed why these had either failed or were likely to fail under the circumstances of this specific investigation. Unlike the applications in some of the cases cited by the defense, *see Ippolito*, 774 F.2d 1482, 1486-87 (9th Cir. 1985), *Blackmon*, 273 F.3d at 1208, *Carneiro*, 861 F.2d 1171, 1180-81 (9th Cir. 1988), there is no reason to believe the application here contained material omissions or false statements.

In short, the application showed that DEA conducted a thorough investigation into Darwin's drug-trafficking operation but this investigation failed to achieve its goals. This Court should thus find that Judge Beistline did not abuse his discretion in determining a wiretap was necessary.

### V. CONCLUSION

For the foregoing reasons, this Court recommends the District Court DENY the defendant's Motion to Suppress at Docket 83.

DATED this 26th day of November, 2019 at Anchorage, Alaska.

S/DEBORAH M. SMITH  
CHIEF U.S. MAGISTRATE JUDGE

*United States v. Diaz-Lara et al.*  
3:17-cr-00152-TMB-DMS  
Final R&R re Motion to Suppress

13

Case 3:17-cr-00152-TMB   Document 108   Filed 11/26/19   Page 13 of 13